## LOCKE'S EXECUTOR *vs.* PALMER ET AL.

1. On bill filed to have a deed absolute on its face declared a mortgage, a writing executed by the grantee several months after the original deed, reciting that it was agreed between him and the grantor, at the time the deed was executed. that if the latter re-paid to him by a specified day the amount of the consideration money expressed in the deed, then he would re-convey to him all the property therein mentioned, and binding himself to re-convey accordingly,—is evidence of the highest character against the grantee; and although it may not be sufficient, of itself, to show that the parties intended the deed to operate as a mortgage, yet if the other evidence in the case, taken in connection with it, establishes that to have been the purpose of the parties, or even renders it doubtful whether a mortgage or a conditional sale was intended, it is enough to induce a court of equity to declare it a mortgage.

2. The inclination of the courts of equity always has been, to lean against conditional sales, because an error which converts a conditional sale into a mortgage is not as injurious as one which changes a mortgage into a conditional sale; and this inclination is strongly manifested, whenever the transaction had its origin in a proposition for a loan, or the relation of debtor and creditor existed between the parties.

3. The fact that the debtor's notes are given up to him by the creditor, and no acknowledgment or other evidence of the debt retained, is a strong circumstance to show that the relation of debtor and creditor was destroyed, but it is not conclusive.

4. Therefore. in this case, a deed absolute on its face was declared a mortgage, on proof of these facts: That the transaction originated in a loan of money, and the relation of debtor and creditor existed between the parties; that some of the articles of personal property conveyed were not enumerated in the deed; that the creditor gave up the debtor's notes, and retained no evidence of the debt; that the creditor, about two months afterwards, acknowledged in writing that, at the time the deed was executed, it was agreed between them that, if the debtor re-paid to him by a specified day the amount expressed as the consideration in the deed, then he would re-convey to him all the property therein mentioned, and bound himself to re-convey accordingly; and that all the property, both real and personal, remained in the debtor's possession, without any agreement for rent or hire so far as the evidence disclosed.

5. Equity looks with a jealous eye upon sales of the equity of redemption to the mortgagee, and requires them to be established by the clearest and most convincing proof. (The evidence in this case was held insufficient.)

6. If a portion of the mortgaged property has been sold with the mortgagor's consent, and the proceeds applied towards the satisfaction of the debt, he may file a bill to redeem the residue.

7. *It seems*, however, that even if there had been no such sale, the mortgagor might, at his option, proceed for a redemption of all or any portion of the property; but if he files a bill to redeem a portion of it only, a decree in

his favor would be a bar to any other proceeding of the like nature upon the same contract.

8. The statute of non-claim does not apply to equities of redemption.

9. If a bill to redeem slaves is filed by two joint mortgagors, and the evidence shows that the slaves belonged to one of them only, this is no material variance.

APPEAL from the Chancery Court of Greene.

Heard before the Hon. JAMES B. CLARK.

THIS bill was filed in July, 1852, by Wm. M. Palmer and B. D. Palmer, late co-partners in trade doing business under the firm name of W. M. & B. D. Palmer, against Volney Boardman, as the executor of John Locke, deceased, and also as the executor of Wm. A. Locke, deceased ; and its object was, to redeem two slaves alleged to have been mortgaged by complainants, in March, 1845, to said Wm. A. Locke. The material allegations of the bill are as follows : That complainants, being much embarrassed in their business, and hard pressed for money to meet their engagements, applied to Wm. A. Locke for a loan or advance of money ; that said Locke agreed to advance about $3504 50 for them, if they would secure to him its re-payment, and as they could not give him personal security, he expressed a desire that they should make him an absolute conveyance, in fee simple, of certain real and personal property of which they were then seized and possessed ; that in consideration of said loan of $3504 50, they accordingly executed to said Locke a deed, dated March 19, 1845, by which they conveyed to him, absolutely and unconditionally on its face, one hundred and sixty acres of land, on which they then resided, known as " Greene Springs," together with two slaves named Oliver and Silvy, and all the articles of household and kitchen furniture then in their possession at said watering-place ; " that said deed, though absolute and unconditional on its face, was intended only to operate as a mortgage to secure the re-payment of said sum of money, and was so received and held by said Locke ; that said Locke being in bad health, and complainants fearing that he might die before said money was re-paid, they applied to him to execute a writing setting forth the true nature of their said contract, and in compliance with their request said Locke

executed to them, on the 26th May, 1845, an instrument in writing, commonly called a defeasance, whereby he bound himself to re-convey to complainants said land and negroes and other property, provided they would re-pay to him said sum of money, loaned as aforesaid, on or before the first day of January next thereafter." These two deeds (the original conveyance and the defeasance) are exhibited with the bill, and prayed to be taken as part thereof.

The bill further alleges, that complainants remained in peaceable and quiet possession of said land and negroes, as well as of all the other property conveyed by said deed, during the lifetime of said Locke, and for several years afterwards, until some time in June, 1847, by and with the consent of said Locke and his executor, by paying interest on said sum of money so advanced to them ; that said Locke died in June, 1845, after having made and published his last will and testament, of which he appointed his brother, John Locke, the executor ; that said will was duly admitted to probate, and said John Locke qualified as executor ; that some time in the spring of 1847 said executor applied to complainants to obtain their consent to sell said land and perishable property appertaining to said springs, and complainants, not being able to refund said money loaned to them as aforesaid, consented to a sale thereof, only reserving the said negroes and their right to redeem them ; that thereupon said John Locke sold the said land to Henry Tutwyler, for about $3,000, and all the said perishable property for about $245, and about the same time took the said negroes into his possession, by and with complainants' consent ; that said negroes continued in his possession until his death, which occurred in the year 1848, during all of which time he recognized complainants' right to redeem them ; that said John Locke, previous to his death, had made and published his last will and testament, which was afterwards duly admitted to probate, and of which the defendant, Volney Boardman, was appointed executor ; that said Boardman qualified as executor, and took possession of said slaves, and has continued to hold them up to the filing of the bill ; " that on or about the 11th May, 1847, but after the sale to said Tutwyler, complainants had a settlement with said John Locke in regard to said transaction, and on said

settlement were found indebted to him, on account thereof, in the sum of $1168 92, a copy of which settlement is now in the possession of said Boardman as executor ; that complainants, not being able to pay said sum of money at that time, agreed to surrender to said Locke the possession of said slaves, as security for its payment, according to their original contract with Wm. A. Locke, and said John Locke agreed to hold said negroes as a security for said debt, subject to said defeasance ; that he so continued to hold them, up to the time of his death, always recognizing complainants' right to redeem them, and never denying the same": that since the said slaves went into the possession of said Locke, the girl Silvy has had three children ; that they are now worth a great deal more than the sum of money for which they were pledged, and their reasonable hire would more than extinguish the balance due on the said debt ; that complainants have several times applied to said Boardman for a settlement of their accounts, and tendered to him whatever balance might be found due him, if he would surrender said slaves, &c.

The prayer of the bill is, for an account of the balance due on said debt and of the hire of the negroes since they went into the possession of said John Locke, for a decree of redemption, and for general relief.

The original deed from the complainants to said Wm. A. Locke, and the writing called a defeasance, are made exhibits to the bill. The latter instrument is as follows :

"Whereas, on the 19th day of March last past, Wm. M. & B. D. Palmer, by their deed of that date, conveyed to me a certain quarter-section of land therein described, being the same on which the "Greene Springs" are situated, also two negroes by the name of Silvy and Oliver, and all the household or kitchen furniture belonging or attached to said Springs", &c., "all of which property is more particularly described in said deed, for the consideration of about $3,587, as well as I now recollect ; and whereas it was agreed between the said Wm. M. & B. D. Palmer and myself, at the time of the execution of said conveyance, that if said Wm. M. & B. D. Palmer, or their assigns, should, on or before the first day of January next, re-pay to me the said sum of $3,587, or whatever sum is specified in said deed as the consideration

thereof, then, and in that event, that I would re-convey to them the said quarter-section of land, the said two negroes, household and kitchen furniture", &c. : "Now, if said Wm. M. & B. D. Palmer, or their assigns, shall, on or before the first day of January next, well and truly pay to me, or to my assigns, the said sum of $3,587, or whatever sum is mentioned in said deed as the consideration thereof, I do hereby bind myself, my heirs, and assigns, in the event of such payment, to re-convey to the said Wm. M. & B. D. Palmer, or their assigns, the said quarter-section of land, the said two negroes, household and kitchen furniture," &c., " conveyed to me by said deed, and immediately upon such reconveyance to deliver possession thereof to the said Wm. M. & B. D. Palmer, or their assigns.

" Given under my hand and seal, this 26th day of May, 1845.
"Test : John Locke." "Wm. A. Locke [seal]."

The defendant answered the bill, admitting that Wm. A. Locke died in June, 1845, and that his will was duly probated on the application of himself and his co-executor, John Locke; that John Locke also died in 1848,—his will was admitted to probate, and letters testamentary thereon granted to him on the 6th November, 1848. He alleges, that he and his co-executor had a settlement with the Probate Court, of their administration on Wm. A. Locke's estate, in August, 1848 ; that complainants never presented any claim to either of them against the estate of their testator, nor did they present any claim to him, as executor of John Locke, within eighteen months after the grant of his letters testamentary, and he had no knowledge whatever of the claim set up in the bill until a short time before the bill was filed. He denies that the deed was intended as a mortgage or security for money lent, or that the writing afterwards signed by Wm. A. Locke was intended to be a defeasance ; alleges that, prior to the 19th March, 1845, said Locke had loaned complainants about $2,000, for the payment of which he held their notes without security ; that about that time they applied to him to borrow more money, and proposed to secure its payment, together with the debt which they already owed him, by a mortgage on property, but said Locke refused to make any such arrangement, and proposed to advance the money which they needed if they

would sell and convey to him property worth the amount of the sums which they then owed and wished to borrow ; that complainants assented to this proposition, and executed said deed in pursuance thereof, and said Locke then advanced the sum which they wished to borrow, and gave up to them their notes which he already held, which two sums together made the amount expressed in the deed as its consideration ; that this was the full value of the property at that time ; that the negroes were the individual property of Wm. M. Palmer, who executed a bill of sale for them to Locke for the expressed consideration of $800, a copy of which bill of sale is appended as an exhibit to the answer.

He further alleges, that the writing exhibited with the bill, though executed by said Wm. A. Locke, is not a defeasance, but operates only as a contract to re-sell to complainants the property conveyed by them, and that it is without consideration ; that he and his co-executor returned these slaves in their inventory of Wm. A. Locke's estate, and they were so treated on the final settlement of his estate ; that the settlement had between John Locke and the complainants in 1847, which is referred to in the bill, and which is attached as an exhibit to his answer, was not confined to the transaction with Wm. A. Locke, but included other matters, " and from that statement it would seem that John Locke purchased the said slaves from complainants by allowing them on said settlement $1168 92 therefor." He denies that John Locke ever held the slaves subject to complainants' alleged right of redemption ; alleges that John Locke told him on his death-bed, as well as a short time previously, that complainants had annoyed him very much, in the then feeble state of his health, by importunities to sell the slaves to some one (thinks Dr. Kittrell's name was mentioned) who would permit them to redeem at some future time, and that he had refused to do so; denies, also, that complainants were consulted about the sale of the Greene Springs.

On bill, answer, exhibits, and proof, the chancellor decreed in favor of the complainants, and his decree is now assigned for error.

JAMES D. WEBB, for the appellant :

I. The deed is absolute on its face, and the answer denies

that it was intended as a mortgage or security for a debt. The complainants must prove that it was intended by the parties to be a security, and this proof must be clear and convincing.—Chapman v. Hughes, 14 Ala. 218 ; 13 *ib.* 247; 21 *ib.* 92 ; 2 Ired. Eq. 560; 4 *ib.* 335. The fact that Wm. A. Locke gave up to the Palmers, when they executed the deed and bill of sale, the notes which he held on them as the evidence of the debt they owed him, and did not take any evidence of the indebtedness from them to him of the consideration expressed in the deed, is a circumstance which shows that it was a sale, and not a security.—Robinson v. Farelly, 16 Ala. 475; Sewall v. Henry, 9 *ib.* 33. Locke could not, if the property failed to pay the debt on a sale, recover the balance.—Eiland v. Radford, 7 Ala. 727. The answer denies that Wm. A. Locke loaned the complainants money on deed of mortgage, or security; and insists that he refused to do so, and that the consideration expressed in the deed and bill of sale was the fair value of the property. The question of mortgage or absolute sale, is a question of fact.—Hopkins v. Thompson, 2 Port. 433. In this case, it is a mixed question of law and fact, to be determined from the bill, answer, exhibits, and proof. 1. The deed is absolute on its face. 2. The writing is not a defeasance. 3. The writing shows that it was a conditional sale—a nude pact.—13 Ala. 247, 252. If it was a conditional sale, and upon consideration, the adequate remedy was at law, and not in chancery. 4. No witness is examined to prove how Wm. A. Locke considered the transaction ; and it matters not how John Locke treated it—the question is, What was the contract between Wm. A. Locke and the complainants?

II. Admit that Wm. A. Locke intended it as a mortgage, and that John Locke so understood and treated it; still the allegations of the bill show that John Locke bought the complainants' equity of redemption in the slaves : the complainants allege in their bill, that they had a settlement with John Locke, on the 11th May, 1847, of the transaction with Wm. A. Locke.—Langdon v. Roane's Adm'r, 6 Ala. 518; Andrews' v. Hobson's Adm'r, 23 *ib.* 218.

III. The claim set up in the bill, and attempted to be enforced, is barred by the statute of non-claim.—Jones v. Light-

foot, 10 Ala. 24; Humphres v. Terrell, 1 *ib.* 650; Freeman v. Baldwin, 13 *ib.* 247, 252.

IV. The bill should have been dismissed for misjoinder of parties. B. D. Palmer had no interest in the slaves sought to be redeemed, except as it was acquired by the conditional purchase from Wm. A. Locke by the writing of May 26, 1845: the slaves were the separate, individual property of Wm. M. Palmer.

Wм. P. WEBB, *contra:*

I. The question presented by the pleadings is, whether the contract between the Palmers and Locke, as shown by exhibits A and B, was a mortgage, or a conditional sale. The Palmers say it was a mortgage. Exhibit A is an absolute deed; but exhibit B shows, that it was agreed between the parties, at the time of the execution of the deed, that the Palmers might redeem the property, and Locke afterwards reduced that agreement to writing.—Freeman v. Baldwin, 13 Ala. 253; 4 Kent's Com. 135, 140, 141; 8 Ired. Eq. R. 197. If it were doubtful whether it was a mortgage or a sale, equity will hold it a mortgage.—Turnipseed v. Cunningham, 16 Ala. 506, and authorities there cited; 8 Ired. Eq. R. 197. The transaction has all the badges of a mortgage, as laid down in the case of Eiland v. Radford, 7 Ala. 724, viz., 1st, the relation of debtor and creditor between the parties; 2d, the borrowing of money by the Palmers from Locke; and, 3d, the disparity between the value of the property and the price. The deed and defeasance must be construed together as one instrument and one contract.—Sewall v. Henry, 9 Ala. 24 to 33. A mortgage is a conveyance of an estate for the security of a debt; the defeasance is a condition upon which the estate is conveyed, usually inserted, though it may be by a separate instrument; and the character of the estate is determined by the intention of the parties, to be derived from their language.—4 Kent's Com., pp. 135, 140, 141. Locke bound himself, not to *re-sell,* but to *re-convey;* and the Palmers remained in possession for more than eighteen months. In McKinstry v. Conly, 12 Ala. 678, the word *"re-sell"* was used, and the court lay great stress upon it. In Eiland v. Radford, 7 *ib.* 724, the word *"re-purchase"* was used, as also in Free-

man v. Baldwin, 13 *ib.* 246; and in those cases the possession was changed.

II. The testimony shows that the parties considered it a mortgage.—See the depositions of Kittrell and Boykin. The statement, or settlement, made in May, 1847, calculates interest on the debt, and gives credit for the sale of real estate, &c.

III. The statute of limitations cannot bar the right to redeem, as the six years did not begin to run until the change of possession in May, 1847.—Sims v. Canfield, 2 Ala. 555; Freeman v. Baldwin, 13 *ib.* 252.

IV. The statute of non-claim does not bar the equity of redemption.—Duval v. McLoskey, 1 Ala. 745; Gordon v. Gibbs, 3 S. & M. 490; 11 Pick. 181. It is a technical trust, and not a claim.—Kane v. Bloodgood, 7 Johns. Ch. 90. The equity of redemption is not a claim to be presented to the executor within the meaning of the statute (Clay's Digest, p. 195, § 17); the mortgage was only an incident to the debt due from Palmer to Locke. The statute of non-claim does not affect the right to recover property upon a claim of title, as in this case: this is a proceeding to recover the slaves, and not a money demand. Can the title to property, real or personal, be barred by the statute of non-claim?—Johnson v. Ames, 11 Pick. 181. The complainants do not claim a debt from Locke's executor, but demand the performance of a specific duty—the specific performance of a contract; and the statute of non-claim is no answer to their demand.

But, if the court should hold that the statute of non-claim applies to an equity of redemption, then it is insisted, that the proof shows that the Palmers did claim the same from John Locke, as executor of Wm. A. Locke, and that he admitted their right; and further, that the statute should have been specially pleaded.—Mardis v. Smith, 2 Ala. 382.

V. If it is insisted that the Palmers should redeem all the property conveyed, the answer is, that the land and other property were sold by John Locke, as executor of Wm. A. Locke, with the consent of the Palmers, and the proceeds applied as a credit on the debt. The sale of a part of the mortgaged property does not affect the right of the Palmers to redeem the slaves.—Wilson v. Troup, 7 Johns. Ch. 37.

VI. The "statement," or settlement, which is relied on as

barring or releasing complainants' right of redemption, was not signed by either party, and merely shows how the debt then stood between them. If the transaction was intended as a mortgage, then the maxim applies, "once a mortgage, always a mortgage"; and the defendant must prove a release. If it was a sale of their equity of redemption, the price was inadequate. On these points, see McKinstry v. Conly, 12 Ala. 682, and cases there cited. John Locke admitted to Boykin, in 1848, as shown by Boykin's testimony, that he held only a lien on the property. If it were doubtful whether complainants released their equity of redemption by the settlement in 1847, the court would hesitate to declare it, as the price stated was only $1168 92, when the testimony of Boykin and Williamson shows that the slaves were then worth $1,500.—2 Sch. & Lef. 673. Any subsequent parol agreement to prevent the equity of redemption is void.—Henry v. Davis, 7 Johns. Ch. 42. Courts of equity look with distrust and jealousy on a sale of an equity of redemption.—Hitchcock's Heirs v. U. S. Bank, 7 Ala. 443 ; Powell on Mortgages, vol. 1, p. 123, note.

VII. The bill of sale by Wm. M. Palmer to Locke was made at the same time with the original deed, and for the same consideration. It can have no effect upon complainants' right to redeem, as it was not necessary to perfect Locke's title to the slaves ; and the defeasance expressly stipulates that complainants might redeem, and that Locke would re-convey.

VIII. In reply to the argument that the contract or agreement, as shown by exhibit B, was without consideration, the answer is, that Wm. A. Locke says, in this defeasance, that that agreement was made contemporaneously with the execution of the original deed.

GOLDTHWAITE, J.—The first question is, whether the transaction between the Palmers and William A. Locke was an absolute sale, or a mortgage. The first instrument which was executed conveys the title to the property unconditionally, and would, if taken by itself, be regarded as what it appears upon its face to be—an absolute sale. The instrument, however, which was executed in May, 1845, some two months afterwards, by Locke, recites that it was agreed between himself

and the Palmers, at the time of the first conveyance, that if the latter should re-pay to him, by the first day of January next thereafter, the amount of the consideration money expressed in the first deed, then he would re-convey to them all the property therein mentioned. This recital is unquestionably written evidence of the very highest character against the party by whom it was executed, and, although it may not be sufficient to show that the parties intended the first instrument to operate as a mortgage, still, if the other evidence in the cause, taken in connection with it, establishes such to have been the purpose of the parties, or even renders it doubtful whether a conditional sale or a mortgage was intended, it is enough to induce a court of equity to declare it a mortgage.—Turnipseed v. Cunningham, 16 Ala. 501.

There are, in most cases of this character, no tests which will enable a court to determine, with anything like positive certainty, whether a mortgage, or a conditional sale, was intended ; but the inclination of equity, in such cases, is always to lean against the latter, for the reason, that an error which converted the transaction into a mortgage would not be as injurious as a mistake which changed a mortgage into a conditional sale ; and this leaning is strongly manifested whenever the contract had its origin in a proposition for a loan, or the relation of debtor and creditor existed between the parties (Crane v. Bonnell, 1 Greene's Ch. 264; Robertson v. Campbell, 2 Call's R. 421; Turnipseed v. Cunningham, *supra*) ; these circumstances being regarded as amongst the circumstances tending to show that a mortgage was intended.— Eiland v. Radford, 7 Ala. 724.

Neither of these tests is wanting in the present case ; and in addition to these is the fact, that a portion of the articles are not enumerated in the bill of sale. The purchase appears to have been in gross, without the value of the property in detail being contemplated ; the re-sale is to take place, if the purchaser *re-pays* the purchase money ; and the buyer, instead of taking possession of the property, allows it to remain with the seller without hire—or at least none is proved—when a portion of it was such as would readily have commanded hire, and another portion such as would have been liable to injury and deterioration in the wear and tear resulting from its use.

All these, and especially the possession of the property remaining with the seller, are inconsistent with the idea of an absolute sale. It is true, that it does not appear that the evidence of the debt due from the Palmers to Locke before the transaction was retained, or any acknowledgment taken for the money advanced ; but this, though a strong circumstance to show that the relation of debtor and creditor was destroyed, is not conclusive.—Turnipseed v. Cunningham, *supra*. Upon a careful examination of the whole evidence, we have great doubt whether the parties contemplated an absolute sale. The inclination of our mind is, rather, that security only was intended ; and such being the fair result of the evidence, we are bound by the principles which govern courts of equity in this class of cases, to declare the contract a mortgage instead of an absolute sale.

But it is urged on behalf of the appellant, that, conceding the instrument to be a mortgage, it is shown that John Locke, the executor of William A. Locke, subsequently purchased the equity of redemption in the slaves which were a portion of the property conveyed. The evidence to sustain this position consists of the memorandum of a settlement made in May, 1847, in the form of a debit and credit account, John Locke charging himself with the sales of the land conveyed, and the proceeds or value of other property, some of which is not embraced by the deed ; and the account is balanced by giving credit of debts against the Palmers. The last item on the credit side of the account is, "Am't of Silvy and Oliver, $1168 92." This account is in the hand-writing of John Locke, and not signed by either of the Palmers. They allege in the bill, it is true, that by a settlement with John Locke they were found in arrears to the amount of $1168 92, and that he retained a memorandum of the settlement ; but there is no positive evidence that this is the settlement they refer to, and it certainly is entitled to but little (if any) weight to show that they consented to the last item on the credit side, which is not admitted by them. "Once a mortgage, always a mortgage," is the rule that was correctly laid down by the chancellor ; and under its influence, when the character of the instrument was determined, the equity of redemption became a necessary incident, and existed with it until it was

proved that they had parted with it. The testimony of the witness Boykin shows the virtual admission of John Locke, after the settlement in 1847, of the right of the Palmers to redeem; and the evidence of Dr. Kittrell is not irreconcilable with that right. He was to purchase the slaves from Locke, by assuming the debt then due, and hold them until the mortgagors paid him the money, or until the debt was paid by their hire. This was, in effect, but little more than the substitution of a third person in the place of the mortgagee; and the close and intimate relations which the same witness proved existed between himself and the Palmers, might have been their inducement for preferring him to become their creditor instead of Locke. Equity looks with a jealous·eye upon sales of equity of redemption to the mortgagee, (Story's Eq. § 1019, and cases there cited,) and requires them to be established by the clearest and most convincing proof, which is far from having been done in the present case.

Another ground taken against the decree is, that as the contract was entire, the bill should have been filed, not to redeem the slaves alone, but the entire property conveyed. In reference to this, it is only necessary to say, that a portion of the property had been sold, and its proceeds applied to the satisfaction of the debt. If this had not been the case, however, we are of the opinion, that it is at the option of the mortgagor to proceed for the redemption of all or any portion of the property. That he seeks the aid of the court in relation to a part of the property only, cannot injuriously affect the mortgagee, as a decree for the redemption of that part would be a bar to any other proceeding of the like nature upon the same contract.

The statute of non-claim is also urged as a bar to the relief sought. That statute provides, that all claims against the estates of deceased persons shall be barred, unless presented to the executor or administrator within eighteen months after the grant of letters, or within that time after the claim shall accrue; with an exception in favor of infants, married women, and claims contracted out of the State.—Clay's Dig. 195, § 17. We are clear, this statute does not refer to claims of title, for the reason, that claims of such a character cannot, in any just sense, be said to be claims against the " estate " of

the deceased : on the contrary, the right to recover is based upon the fact that the property claimed does not belong to the estate. As to whether the statute would bar the damages arising from the detention of the property as against the estate, it is unnecessary now to determine. The failure to present the claim would not prevent the mortgagee from suing the personal representative of the mortgagor, in an action of detinue, and recovering the property, and at least nominal damages.—Trecothick v. Austin, 3 Mass. Rep. 29 ; Johnson v. Ames, 11 Pick. 173. In Sims v. Canfield, 2 Ala. 555, the bill to redeem personal property was, in connection with the statute of limitations, assimilated to an action of detinue, and by analogy held to be barred in six years after adverse possession. The same principle must obtain with regard to the statute of non-claim. The equity of redemption is simply the right of the mortgagor to the specific property after the debt for which it is bound is discharged ; and in equity he is always considered as the real owner, until he is debarred from his right by judicial decree, or in some other mode.—4 Kent's Com. 136. The bill to redeem, in the aspect in which we are considering it, is governed by the same principles as the bill to foreclose, and if the latter is not affected by the statute of non-claim, the former cannot be.

The only remaining ground of objection is, that the title to the slaves was proved to be in one of the complainants alone, instead of both of them jointly. But this circumstance, as the mortgage is executed by them in their joint names, can make no difference. The bill is filed upon the contract as it was made. The mortgagee, by becoming a party to, and accepting the joint instrument, recognized the title of the other party as joint, and having done so, there is no good reason, in a suit of this kind, why he should be allowed to deny it.

Decree affirmed, with costs.